**Richardson Koudelka**
Michael D. Richardson
Two Turtle Creek
3838 Oak Lawn, Suite 450
Dallas, Texas 75219
214-217-7575
mrichardson@rklawtexas.com

**Excolo Law, PLLC**
Keith Altman (*pro hac vice* pending)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
kaltman@excololaw.com

Ari Kresch (*pro hac vice pending*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
1-800-LawFirm
akresch@1800lawfirm.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

| | |
|---|---|
| **JESUS RETANA AND ANDREW MOSS**<br><br>**PLAINTIFFS,**<br>**V.**<br><br>**TWITTER, INC., GOOGLE LLC, FACEBOOK, INC.**<br><br>**DEFENDANTS.** | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, by and through their attorneys, allege the following against Defendants Twitter, Google, and Facebook:

## **NATURE OF ACTION**

1.     This is an action for damages against Twitter, Google, and Facebook pursuant to the Antiterrorism Act, 18 U.S.C. § 2333 ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222 (2016), for aiding, abetting, and knowingly providing support and resources to ISIS, the notorious designated foreign terrorist organization that carried out the July 7, 2016 shooting of Dallas Police Officers by Micah Johnson who was radicalized, in part, by HAMAS' use of Defendants' sites.  In the attack, five officers were murdered, nine officers were wounded including Plaintiff Jesus Retana.  Others, such as Plaintiff Andrew Moss suffered severe emotional distress.

2.     The ATA's civil remedies have served as an important means for enforcing the federal criminal anti-terrorism provisions since the early 1990s.

3.     Congress enacted the ATA in October 1992 as a legal complement to criminal penalties against terrorists that kill or injure Americans abroad, specifically intending that the civil provisions would not only provide a mechanism for

compensating victims of terror but also serve as an important means of depriving terrorists of financial resources to carry out attacks.

4.      Following the bombing of the World Trade Center in New York by *al-Qaeda* in 1993, Congress targeted terrorist resources again by enacting 18 U.S.C. § 2339A in September 1994, making it a crime to provide material support or resources knowing or intending that they will be used in preparing or carrying out terrorist acts.

5.      In April 1996, Congress further expanded the effort to cut off resources to terrorists by enacting 18 U.S.C. § 2339B, making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization.

6.      In the wake of the terror attacks on the United States by *al-Qaeda* of September 11, 2001 killing nearly 3,000 Americans, Congress amended the "material support" statutes, 18 U.S.C. §§ 2339A-B, via the PATRIOT Act in October 2001 and the Intelligence Reform and Terrorism Prevention Act of 2004, to impose greater criminal penalties for violating these statutes and to expand the definition of "material support or resources" prohibited thereby.

7.      In September 2016, Congress amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism.

The Justice Against Sponsors of Terrorism Act ("JASTA"), Public Law No: 114-222 (09/28/2016) states in relevant part:

> Purpose.--The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.
>
> (JASTA 2(b))

8.     For years, Defendants have knowingly and recklessly provided the terrorist group HAMAS with accounts to use its social networks as a tool for spreading extremist propaganda, raising funds, and attracting new recruits. This material support has been instrumental to the rise of HAMAS and has enabled it to carry out numerous terrorist attacks and to incite others to carry out terrorist attacks, including the July 7, 2016 shooting of Dallas Police Officers by Micah Johnson.

9.     Without Defendants Twitter, Facebook, and Google (YouTube), HAMAS' ability to radicalize and influence individuals to conduct terrorist operations outside the Middle East would not have been possible. Like HAMAS, Defendants also allow ISIS to use their sites to conduct terrorist operations. According to the Brookings Institution, ISIS "has exploited social media, most

notoriously Twitter, to send its propaganda   and messaging out to the world and to draw in people vulnerable to radicalization."   Using Defendants' sites, "ISIS has been able to exert an outsized impact on how the world perceives it, by disseminating images of graphic violence (including the beheading of Western journalists and aid workers) . . . while using social media to attract new recruits and inspire lone actor attacks."   According to FBI Director James Comey, ISIS has perfected its use of Defendants' sites to inspire small-scale individual attacks, "to crowdsource terrorism" and "to sell murder."

10.   Since first appearing on Twitter, terrorist accounts on Twitter have grown at an astonishing rate and, until recently, ISIS and HAMAS maintained official accounts on Twitter unfettered. These official accounts included media outlets, regional hubs and well-known HAMAS and ISIS members, some with tens of thousands of followers. For example, HAMAS's official Twitter page @HamasInfoEn has 37.3 thousand followers.



a.   *Figure 2 HAMAS' official Twitter page.*

11.   The Arabic version of HAMAS' official Twitter page @hamasinfo has been active since October 2010 and boasts 281,000 followers.[1]

12.   Another HAMAS Twitter account @HamasGlobalPR  has been active since June 2010 and boasts 9,593 followers.[2]

13.   As with Twitter, HAMAS has used Google (YouTube) and Facebook in a similar manner. Defendants are fully aware that HAMAS and other extremist groups use their sites to conduct terrorist operations.

14.   Plaintiffs' claims are based not upon the content of HAMAS' social media postings, but upon Defendants provision of the infrastructure which provides material support to HAMAS.  Furthermore, Defendants profit from HAMAS by placing ads on HAMAS' postings.  For at least one of the Defendants, Google,

---

[1] https://twitter.com/hamasinfo?lang=en
[2] https://twitter.com/hamasglobalpr?lang=en

revenue earned from advertising is shared with HAMAS.   Lastly, Defendants incorporate HAMAS' postings to create unique content by combining the HAMAS postings with advertisements selected by Defendants based upon HAMAS' postings and the viewer looking at the postings and the advertisements.

15.     By providing their platforms and other online services and personnel to HAMAS, Defendants: violated the federal prohibitions on providing material support or resources for acts of international terrorism (18 U.S.C. § 2339A) and providing material support or resources to designated foreign terrorist organizations (18 U.S.C. § 2339B); aided and abetted and conspired with a designated FTO in the commission of acts of international terrorism as defined by 18 U.S.C. § 2331; and committed acts of international terrorism as defined by 18 U.S.C. § 2331. Accordingly, Defendants are liable pursuant to 18 U.S.C. § 2333 to the plaintiffs, who were injured by reason of acts of international terrorism.

## **PARTIES**

16.     Plaintiff Jesus Retana ("Retana") is a citizen of the United States domiciled in the State of Texas and is over the age of 18.   During the attack, Retana was shot in the left arm and required surgery for the removal of the bullet.   Retana suffers and continues to suffer the effects of the wound.   Furthermore, Retana has suffered sever emotional distress requiring medical treatment.

17.     Plaintiff Andrew Moss is a citizen of the United States domiciled in the State of Texas and is over the age of 18.  He is the husband of Jesus Retana.  As a result of Defendants allowing HAMAS and other terrorist organizations to conduct terrorist operations using their sites including the deadly attack on July 7, 2016, Plaintiff Jesus Retana has suffered severe emotional distress over the injury of his husband.

18.     Defendant Twitter, Inc. ("Twitter") is a publicly traded U.S. company incorporated in Delaware, with its principal place of business at 1355 Market Street, Suite 900, San Francisco, California 94103.

19.     Defendant Facebook, Inc. ("Facebook") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1601 Willow Road, Menlo Park, California, 94025.

20.     Defendant Google LLC ("Google") is a publicly traded U.S company incorporated in Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Google owns the social media site YouTube.  For the purposes of this complaint, Google and YouTube are used interchangeably.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and 18 U.S.C. § 2333(a) as a civil action brought by a citizen of

the United States injured by reason of an act of international terrorism and the estate,

survivor, or heir of a United States citizen injured by reason of an act of international

terrorism.

22.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because

a substantial part of the events giving rise to the claims in this action occurred in this

district and Defendants are headquartered in this district.

## ALLEGATIONS

23.     HAMAS is an offshoot of the radical militant Islamist organization

known as the Muslim Brotherhood. The Muslim Brotherhood was founded in Egypt

in 1928. The Muslim Brotherhood's mottos include: "Islam is the answer"; and

"*Allah* is our objective, the *Qur'an* is the Constitution, the Prophet [Mohammed] is

our leader, *jihad* [holy war] is our way, death for the sake of *Allah* is our wish."

24.     When Palestinians launched the "First *Intifada*" (or "uprising") against

Israel in December 1987, the leader of the Muslim Brotherhood in Gaza, Sheik

Ahmad Yassin formed *Harakat al-Muqawama al-Islamiyya* (the "Islamic

Resistance Movement") to join in the violence against Israel and to establish an

alternative Islamist movement to challenge the largely secular Palestinian Liberation

Organization's ("PLO") claim as the exclusive leadership of the Palestinians. The

Islamic Resistance Movement is known by its Arabic acronym: "HAMAS." The

following are the emblem and flag of the terrorist organization HAMAS:



*Figure 3: the HAMAS emblem and flag*

25.    Article 6 of the HAMAS Charter states: "The Islamic Resistance Movement is a distinguished Palestinian movement, whose allegiance is to *Allah*, and whose way of life is Islam. It strives to raise the banner of *Allah* over every inch of Palestine." Article 13 states: "Palestine is an Islamic land . . . Since this is the case, the Liberation of Palestine is an individual duty for every Muslim wherever he may be." Article 15 states: "The day the enemies usurp part of Muslim land, *Jihad* becomes the individual duty of every Muslim. In the face of the Jews' usurpation, it is compulsory that the banner of *Jihad* be raised."

26.    The *Izz al-Din al-Qassam* Brigades (the "*al-Qassam* Brigades") is a constituent paramilitary organization within HAMAS known for carrying out many of HAMAS's terrorist attacks, including shootings, suicide bombings, IED bombings, missile attacks, underground tunnel attacks, and more. HAMAS and the *al-Qassam* Brigades also have other paramilitary units and brigades, often named after prominent HAMAS leaders considered "martyrs" by HAMAS. The following is the emblem of the *al-Qassam* Brigades:



*Figure 4: Emblem of the al-Qassam Brigades*

27.    HAMAS also has other constituent organizations and associations that are controlled by HAMAS that operate as part of HAMAS and carry out its activities, including HAMAS's student wing, the Islamic Bloc. The following is the emblem of HAMAS' Islamic Bloc:



*Figure 5: Emblem of the HAMAS' Islamic Bloc*

28.    Between the time of its founding in December 1987 until the present, HAMAS carried out thousands of terrorist attacks in Israel, the West Bank, and Gaza, murdering hundreds of Israeli and U.S. citizens, as well as the nationals of many other countries, and wounding thousands more. HAMAS's policy and practice of carrying out terrorist attacks was and are notorious and well-known to the public at large and to social media.

## BACKGROUND: U.S. ANTITERRORISM ENFORCEMENT LEGISLATION

### Criminal Punishment of International Terrorism

29.     In the 1980's, terrorist groups carried out a number of major terror attacks around the world, killing and injuring many Americans abroad.

30.     Among these terror attacks were:

   a. The April 1983 suicide bombing of the U.S. Embassy in Beirut, Lebanon, killing 63 people, including 17 Americans;

   b. The October 1983 suicide bombing of U.S. Marine barracks in Beirut, Lebanon, killing 241 U.S. Marines, 58 French peacekeepers, and 6 civilians, and injuring more than 100 others;

   c. The December 1983 terrorist bombings of the U.S. Embassy and the residential quarters of American company Raytheon in Kuwait;

   d. The September 1984 terrorist bombing of a U.S. Embassy annex northeast of Beirut, Lebanon, killing 14 people, including 2 Americans, and injuring dozens;

   e. The June 1985 hijacking of TWA flight 847, in which an American Navy diver was killed;

   f. The October 1985 hijacking of the Achille Lauro cruise ship and murder of wheelchair-bound American Leon Klinghoffer; and

g. The December 1985 terrorist attacks using assault rifles and hand grenades at the Rome and Vienna airports, killing 19, including 4 Americans, and injuring about 140 others.

31.     In response to these and other attacks, Congress enacted the "Omnibus Diplomatic Security and Antiterrorism Act of 1986" ("Antiterrorism Act of 1986").[3]

32.     Title XII of the Antiterrorism Act of 1986, titled "Criminal Punishment of International Terrorism," amended Title 18 of the U.S. Code ("Crimes and Criminal Procedure"), Part I ("Crimes"), to add a new chapter, then-designated as Chapter 113A and titled, "Extraterritorial Jurisdiction Over Terrorist Acts Abroad Against United States Nationals."[4]

33.     This new chapter provided criminal penalties for killing, conspiring, or attempting to kill a national of the United States outside the United States, or engaging in physical violence outside the United States with the intent to cause serious bodily injury to a national of the United States or that results in serious bodily injury to a national of the United States.[5]

## Private Enforcement: The Antiterrorism Act of 1992 ("ATA")

---

3 Pub. L. 99-399 (Aug. 27, 1986), 100 Stat. 853-901.

4 Pub. L. 99-399, title XII, § 1202(a), 100 Stat. 896. Chapter 113A was subsequently re-designated as Chapter 113B and renamed "Terrorism."

5 *Id.* This section, originally enacted as 18 U.S.C. § 2331, is now found (as amended) at 18 U.S.C. § 2332 (titled "Criminal penalties").

34.   As acts of terror unfortunately continued, the United States continued to seek new methods of combating international terrorism.

35.   In October 1992, Congress enacted the Antiterrorism Act of 1992 ("ATA"),[6] which amended the chapter of the Criminal Code dealing with terrorism to include a private right of action for U.S. nationals injured by acts of international terrorism as a legal complement to the criminal penalties against terrorists that kill or injure Americans abroad. *See* 18 U.S.C. § 2333.

36.   ATA claims necessarily involve criminal law, because the ATA's definition of "international terrorism" is limited to activities that, *inter alia*, "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." *See* 18 U.S.C. § 2331.

37.   Thus, in enacting the ATA, Congress sought not only to provide victims of terror with a remedy to seek compensation, but also specifically intended that the private cause of action would serve as an important tool for enforcing the federal criminal antiterrorism statutes by creating a method of depriving terrorists of financial resources to carry out attacks.

---

6 The ATA was enacted as part of the "Federal Courts Administration Act of 1992." *See* Pub. L. 102-572, title X, § 1003 (October 29, 1992); 106 Stat. 4521.

38.     Indeed, as the ATA was being considered in Congress, the U.S. State Department's Deputy Legal Advisor, Alan J. Kreczko, testified before the Senate Judiciary Committee's Subcommittee on Courts and Administrative Practice that this proposed bill "will <u>add to the arsenal of legal tools</u> that can be used against those who <u>commit acts of terrorism</u> against United States citizens abroad."[7]

39.     The Deputy Legal Advisor also testified:

   a.  "[T]his bill will provide general jurisdiction to our federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas.

   b.  We view this bill as a welcome addition to the growing web of law we are weaving against terrorists. . . . The existence of such a cause of action . . . may <u>deter terrorist groups</u> from maintaining assets in the United States, from benefiting from investments in the U.S. and from soliciting funds within the U.S. In addition, other countries may follow our lead and implement complimentary national measures, thereby <u>increasing obstacles to terrorist operations</u>.

   c.  Moreover, the bill may be useful in situations in which the rules of evidence or standards of proof preclude the U.S. government from effectively <u>prosecuting</u> a criminal case in U.S. Courts. Because a different evidentiary standard is involved in a civil suit, the bill may <u>provide another vehicle for ensuring that terrorists do not escape justice</u>."[8]

40.     Likewise, Senator Grassley, one of the sponsors of the bill, explained a purpose of the ATA's civil cause of action as follows:

---

7 "Statement of Alan J. Kreczko, Deputy Legal Adviser, On S. 2465: A bill to provide a new civil cause of action in federal court for terrorist acts abroad against United States nationals," *Before the Subcommittee on Courts and Administrative Practice of the Senate Judiciary Committee* (July 25, 1990) (emphasis added), https://www.state.gov/documents/organization/28458.pdf.
8 *Id.* (emphasis added).

    a. "The United States must take a strong stand against terrorism. The Department of State testified that this bill would <u>add to the arsenal of legal tools</u> that can be used against those who <u>commit acts of terrorism</u> against U.S. citizens abroad.

    b. . . .

    c. Now is the time for action. Now is the time to strengthen our ability to both <u>deter and punish</u> acts of terrorism.

    d. We must make it clear that terrorists' assets are not welcome in our country. And if they are found, <u>terrorists will be held accountable</u> where it hurts them most: at their lifeline, their funds."[9]

41.    In July 1992, a Senate committee report further explained: "By its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism, [the civil provisions of the ATA] would interrupt, or at least imperil, the flow of money [to terrorist organizations.]"[10]

42.    The committee report also stated that 18 U.S.C. § 2333 "extends the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines."[11]

### Enactment of the "Material Support" Criminal Statutes

43.    On February 26, 1993, a group of *al-Qaeda* terrorists detonated a truck bomb under the North Tower of the World Trade Center in New York City,

---

9 136 Cong. Rec. 26716-26717 (Oct. 1, 1990) (emphasis added), https://www.gpo.gov/fdsys/pkg/GPO-CRECB-1990-pt19/pdf/GPO-CRECB-1990-pt19-1.pdf.
10 S. Rep. No. 102-342, 22 (1992).
11 *Id.* at 45.

attempting to cause the collapse of both towers and the death of thousands of Americans.

44.     Although the damage from the 1993 World Trade Center bombing was limited, it nevertheless killed 6 people and injured more than 1,000 others.

45.     In response to the 1993 World Trade Center bombing among other things, Congress enacted new legislation again aimed at depriving terrorists of the resources needed to carry out attacks.

46.     Thus, in September 1994, Congress enacted the "Violent Crime Control and Law Enforcement Act of 1994,"[12] which included a new criminal statute, 18 U.S.C. § 2339A ("Providing material support to terrorists"), making it a crime to provide material support or resources, or to conceal or disguise the nature, location, source, or ownership of material support or resources, knowing <u>or</u> intending that they are to be used in preparation for, or in carrying out illegal terrorist acts.

47.     As originally enacted, 18 U.S.C. § 2339A(a) defined "material support or resources" to mean: "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, but does not include humanitarian assistance to persons not directly involved in such violations."

---

12 Pub. L. 103-322 (Sept. 13, 1994), 108 Stat. 1796-2151.

48. In April 1996, Congress enacted the "Antiterrorism and Effective Death Penalty Act of 1996" ("AEDPA").[13]

49. Among other things, the AEDPA amended 18 U.S.C. § 2339A to move the definition of "material support or resources" from subsection (a) to subsection (b) of § 2339A, to delete the phrase "but does not include humanitarian assistance to persons not directly involved in such violations" from that definition, and to insert the phrase "except medicine or religious materials" in its place.

50. In addition, the AEDPA enacted 18 U.S.C. § 2339B ("Providing material support or resources to designated foreign terrorist organizations"), making it a crime to knowingly provide material support or resources to a designated foreign terrorist organization ("FTO"), without regard to how such support or resources will be used.

51. Title 18 U.S.C. § 2339B incorporates and adopts by reference the definition for "material support or resources" set out in § 2339A.

52. Regarding the new § 2333B, the House Judiciary Committee report explained:

> "This section recognizes the fungibility of financial resources and other types of material support. Allowing an individual to supply funds, goods, or services to an organization, or to any of its subgroups that draw significant funding from the main organization's treasury, helps defray the cost to the terrorist organization of

---

13 Pub. L. 104-132 (Apr. 24, 1996), 110 Stat. 1214-1319.

running the ostensibly legitimate activities. This in turn frees an equal sum that can then be spent on terrorist activities."[14]

53.    In section 301 of the AEDPA, Congress enacted specific findings and

a purpose of the AEDPA's Title III ("International Terrorism Prohibitions"), Subtitle

A ("Prohibition on International Terrorism Fundraising"), including the following:

> "(a) FINDINGS.—The Congress finds that—
> International terrorism is a serious and deadly problem that threatens the vital interests of the United States;
> the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign terrorist organizations engaged in terrorist activity;
> …
> (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States;
> …
> (7) some foreign terrorist organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.
> (b) PURPOSE.—The purpose of this subtitle is to provide the Federal Government <u>the fullest possible basis, consistent with the Constitution</u>, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities."[15]

---

14 H. Rept. 104-383, 81 (1995).
15 Pub. L. 104-132, § 301, 110 Stat. 1247 (emphasis added).

## Executive Order No. 13224: Global Terrorism Sanctions

54.    On the morning of September 11, 2001, several teams of *al-Qaeda* operatives carried out terrorist hijackings of civilian passenger aircraft in the United States with the purpose of crashing them into various targets, causing enormous damage and mass murder (the "9/11 Attacks").

55.    In the course of the 9/11 Attacks, *al-Qaeda* terrorists crashed two aircraft into the World Trade Center towers in New York, causing the fiery collapse of both towers, a third aircraft was crashed into the U.S. military headquarters (the "Pentagon") in Washington, D.C., and a fourth aircraft was crashed into a field in Pennsylvania.

56.    The 9/11 Attacks killed nearly 3,000 people and injured more than 6,000 others, and caused more than $10 billion in damage to property.

57.    On September 23, 2001, in response to the 9/11 Attacks, President George W. Bush issued Executive Order No. 13224 ("EO 13224") pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.* ("IEEPA"), and other authorities.

58.    In EO 13224, President Bush found that "grave acts of terrorism and threats of terrorism committed by foreign terrorists . . . and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy,

and economy of the United States," and he declared a national emergency to deal with such threats.

59.     EO 13224 legally blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGTs"), prohibited the provision of funds, goods, or services for the benefit of SDGTs, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGTs, as well as their subsidiaries, front organizations, agents, and associates.

60.     The prohibitions of EO 13224 remain in effect.

61.     Pursuant to EO 13224, subsequent Presidential Executive Orders, the IEEPA, and other statutory authorities, the U.S. Department of the Treasury has enacted federal regulations setting out legal sanctions imposed against SDGTs. *See* 31 C.F.R. Part 594 ("Global Terrorism Sanctions Regulations").

62.     Title 31 C.F.R. § 594.204 prohibits "engag[ing] in any transaction or dealing in property or interests in property of [SDGTs], including but not limited to the following transactions: (a) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any [SDGT]; and (b) The receipt of any contribution of provision of funds, goods, or services from any [SDGT]."

63.     Title 31 C.F.R. § 594.205 prohibits "any transaction … that evades, avoids, has the purpose of evading or avoiding, or attempts to violate any of the

prohibitions set forth in [31 C.F.R. Part 594]," as well as "any conspiracy formed

for the purpose of engaging in a transaction prohibited by [31 C.F.R. Part 594]."

64.    Title 31 C.F.R. § 594.309 provides the following expansive definition

of property and property interest:

> "The terms *property* and *property interest* include, but are not
> limited to, money, checks, drafts, bullion, bank deposits, savings
> accounts, debts, indebtedness, obligations, notes, guarantees,
> debentures, stocks, bonds, coupons, any other financial
> instruments, bankers acceptances, mortgages, pledges, liens or
> other rights in the nature of security, warehouse receipts, bills of
> lading, trust receipts, bills of sale, any other evidences of title,
> ownership or indebtedness, letters of credit and any documents
> relating to any rights or obligations thereunder, powers of
> attorney, goods, wares, merchandise, chattels, stocks on hand,
> ships, goods on ships, real estate mortgages, deeds of trust,
> vendors' sales agreements, land contracts, leaseholds, ground
> rents, real estate and any other interest therein, options,
> negotiable instruments, trade acceptances, royalties, book
> accounts, accounts payable, judgments, patents, trademarks or
> copyrights, insurance policies, safe deposit boxes and their
> contents, annuities, pooling agreements, <u>services of any nature
> whatsoever, contracts of any nature whatsoever, and any other
> property, real, personal, or mixed, tangible or intangible, or
> interest or interests therein, present, future or contingent</u>." (italics
> in original; underline added).

65.    In addition, 31 C.F.R. § 594.306 provides: "Except as otherwise

provided in this part, the term *interest* when used with respect to property (e.g., "an

interest in property") means an interest of any nature whatsoever, direct or indirect."

(italics in original).

66.     Willful violations of Executive Order No. 13224 and 31 C.F.R. Part 594 are subject to federal criminal penalties pursuant to the IEEPA. *See* 50 U.S.C. § 1705.

## Post-9/11 Amendments to 18 U.S.C. §§ 2339A-B

67.     In the wake of the 9/11 Attacks, Congress passed the "USA PATRIOT Act" in October 2001.[16]

68.     Among other things, the USA PATRIOT Act increased the penalties for violation of 18 U.S.C. §§ 2339A-B.

69.     The USA PATRIOT Act also added "expert advice or assistance" to the definition of "material support or resources" applicable to §§ 2339A-B.

70.     In December 2004, as part of the "Intelligence Reform and Terrorism Prevention Act of 2004,"[17] Congress enacted the "Material Support to Terrorism Prohibition Enhancement Act of 2004,"[18] designed to further extend the reach of U.S. antiterrorism statutes.

71.     The 2004 amendments to the U.S. antiterrorism statutes included an expansion and clarification of the definition of "material support or resources" applicable to 18 U.S.C. §§ 2339A-B, by substituting the following language in 18 U.S.C. § 2339A(b):

---

16 Pub. L. 107-56 (Oct. 26, 2001), 115 Stat. 272-402.
17 Pub. L. 108-458 (Dec. 17, 2004), 118 Stat. 3638-3872.
18 *Id.* at Title VI ("Terrorism Prevention"), Subtitle G ("Providing Material Support to Terrorism"), 118 Stat. 3761-3764.

"(b) DEFINITIONS.—As used in this section—

a.     the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

b.     the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

c.     the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

72.     In addition, the 2004 amendments to 18 U.S.C. § 2339B, among other things, clarified the "knowledge" required to violate § 2339B, by adding the following sentence to the end of § 2339B(a)(1):

"...To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)."

73.     On April 20, 2005, the U.S. Department of Justice presented testimony to the U.S. Senate Judiciary Committee's Subcommittee on Terrorism, Technology

and Homeland Security concerning the effectiveness of the material support statutes

as amended in 2004.[19]

74.     The Department of Justice testimony included the following:

> "The material support statutes, as enhanced and clarified by the USA PATRIOT Act in 2001, and the Intelligence Reform and Terrorism Prevention Act just a few months ago, are critical features of the law enforcement approach to counterterrorism. Rather than criminalizing the violent acts used by terrorists, these statutes recognize that there are important components of the terrorist infrastructure that stop short of actual attacks. We know from experience that terrorists need funding and logistical support to operate. They need to raise funds, open and use bank accounts to transfer money, and to communicate by phone and the Internet. They need travel documents. They need to train and recruit new operatives, and procure equipment for their attacks. People who occupy this position in the terrorism division of responsibility might not themselves be bomb-throwers. The front-line terrorists cannot operate without specialists. The material support statutes are designed to reach the non-violent specialists and the logistical support networks.
> ...
> The operation of the material support statutes is also illustrated by a number of pending prosecutions...
> ...
> [One] § 2339A case involves Babar Ahmad and Azzam Publications, charged in Connecticut in October of 2004. Ahmad, a resident of the United Kingdom, allegedly operated and directed Azzam Publications and its family of Internet websites to recruit and assist the Chechen mujahideen and the Taliban and to raise funds for violent jihad in Afghanistan, Chechnya and other locations. These

---

19 "Statement of Daniel Meron, Principal Deputy Assistant Attorney General, Civil Division, and Barry Sabin, Chief, Counterterrorism Section, Criminal Division, Before the Subcommittee on Terrorism, Technology and Home Security, Committee on the Judiciary, United States Senate, Concerning the Federal Material Support Statutes," *U.S. Department of Justice* (Apr. 20, 2005).

websites existed and operated throughout the world, including in the United States. Along with other Internet media allegedly created and operated by Ahrnad, these sites gave instructions for travel to Pakistan and Afghanistan to fight with these groups and for surreptitious transfer of funds to the Taliban; they also solicited military items for these groups, including gas masks and night vision goggles. The websites also advertised videotapes – allegedly produced by Ahmad and others – depicting violent jihad in Chechnya, Bosnia, and Afghanistan, and the torture and killing of captured Russian troops.

Ahmad has been charged with crimes that include providing material support to terrorists under 18 U.S.C. 2339A. We describe this indictment to you – in part – to highlight the use of the Internet by those who support their violent goals through communications, recruiting and propaganda. This is criminal conduct, not rights protected by the First Amendment. The government must meet the challenges posed by the technology of the twenty-first century through the use of all our tools, including criminal investigation and prosecution.

...

Significantly, the definition of 'material support or resources' was expanded to encompass all property – whether tangible or intangible – and all services, except for medicine and religious materials. The definition formerly was limited to specified types of material support and 'other physical assets.' Congress's action to clarify this definition assures that no form of terrorist assistance or activity will escape the reach of the statute."[20]

## **The Justice Against Sponsors of Terrorism Act ("JASTA")**

---

20 *Id.* (emphasis in original).

75.    In September 2016, Congress enacted JASTA,[21] which amended the ATA's civil provisions to recognize causes of action for aiding and abetting and conspiring with foreign terrorist organizations who plan, prepare, or carry out acts of international terrorism.

76.    In enacting JASTA, Congress made a number of specific findings, including the following:

> "(a) FINDINGS.—Congress finds the following:
> a.    International terrorism is a serious and deadly problem that threatens the vital interests of the United States.
> b.    International terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States.
> c.    Some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds outside of the United States for conduct directed and targeted at the United States.
> d.    It is necessary to recognize the substantive causes of action for aiding and abetting and conspiracy liability under chapter 113B of title 18, United States Code.
> e.    The decision of the United States Court of Appeals for the District of Columbia in Halberstam v. Welch, 705 F.2d 472 (D.C. Cir. 1983), which has been widely recognized as the leading case regarding Federal civil aiding and abetting and conspiracy liability, including by the Supreme Court of the United States, provides the proper legal framework for how such liability should function in the context of chapter 113B of title 18, United States Code.

---

21 Pub. L. 114-222 (Sept. 28, 2016); 130 Stat. 852.

f.    <u>Persons, entities</u>, or countries that <u>knowingly or recklessly contribute material support or resources</u>, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, <u>necessarily direct their conduct at the United States</u>, and should reasonably anticipate being brought to court in the United States to answer for such activities.

g.    The United States has a vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system in order to pursue civil claims against persons, entities, or countries that have knowingly or recklessly provided material support or resources, directly or indirectly, to the persons or organizations responsible for their injuries."[22]

77.    Congress also specifically stated that the purpose of JASTA was as follows:

"(b) PURPOSE.—The purpose of this Act is to <u>provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States</u>, to seek relief against <u>persons, entities</u>, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."[23]

## **Terrorist Designation of HAMAS**

78.    On October 8, 1997, the U.S. Secretary of State officially designated

---

22 JASTA § 2(a) (emphasis added).
23 JASTA § 2(b) (emphasis added).

HAMAS (including specifically its "*Izz al-Din al-Qassam* Brigades") as a "Foreign Terrorist Organization" ("FTO") pursuant to § 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189, as amended by the AEDPA. 62 Fed. Reg. 52650 (1997). This designation remains in effect to this day.

79.     After the September 11, 2001, terrorist attacks on the United States, U.S. President George W. Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." Executive Order No. 13224 blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGT"s), prohibited the provision of funds, goods or services for the benefit of SDGT's, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGT's, as well as their subsidiaries, front organizations, agents, and associates.

80.     The U.S. Secretary of State officially designated HAMAS (including its *Izz al- Din al-Qassam* Brigades) as an SDGT pursuant to Executive Order No. 13224 on October 31, 2001. 67 Fed. Reg. 12633-12635 (2002). This designation remains in effect to this day.

81.     Between 1999 and the dates of the terrorist attacks at issue in this case, the courts of the United States, including this Court, have published a number of

decisions finding that HAMAS was responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

### HAMAS is Dependent on Twitter, YouTube, and Facebook to Terrorize

### HAMAS Uses Defendants to Recruit New Terrorists

82.   One of HAMAS's primary uses of Defendants' sites is as a recruitment platform, particularly to draw fighters from Western countries.

83.   HAMAS reaches potential recruits by maintaining accounts on Twitter, YouTube, and Facebook so that individuals across the globe may reach out to them directly. After the first contact, potential recruits and HAMAS recruiters often communicate via Defendants' Direct Messaging capabilities. This is similar to methods used by ISIS in conducting ISIS-sponsored terrorist activities. According to FBI Director James Comey, "[o]ne of the challenges in facing this hydra-headed monster is that if (ISIS) finds someone online, someone who might be willing to travel or kill in place they will begin a Twitter direct messaging contact." Indeed, according to the Brookings Institution, some ISIS members "use Twitter purely for private messaging or covert signaling."  As with ISIS, HAMAS uses Defendants sites for similar purposes.

84.   The Washington Institute reported that social media "enables terrorist groups to conduct a virtual recruitment drive that, while passive and intangible, has the capacity to reach out to a far larger audience -- one that can be reached at any time of day, in any weather, under any conditions (i.e., even when neighborhoods

are under curfew or closure), and anywhere -- not just the West Bank and Gaza Strip, but the world entire. To this end, Hamas operates websites in Arabic, English, Russian, French, Faris (Persian), Urdu, and Malay, which are run off servers in the United States, Russia, Ukraine, and Indonesia.[24]

85.    CBC also reported that HAMAS recruits through social media. Gabriel Weimann, of the University of Haifa, stated that "Today, about 90 percent of organized terrorism on the Internet is being carried out through social media. By using these tools, the organizations are able to be active in recruiting new friends without geographical limitations." [25]

86.    Hamas has also used YouTube videos as a way to solicit potential recruits. One example of this is the video below which is a recruitment video meant for children.

---

[24] http://www.washingtoninstitute.org/policy-analysis/view/teaching-terror-how-hamas-radicalizes-palestinian-society
[25]



*Figure 6: A HAMAS recruitment video for children posted on YouTube*

## **HAMAS Uses Defendants to Fund Terrorism**

87.     HAMAS also uses Defendants to raise funds for its terrorist activities.

88.     It has been reported that HAMAS has used Facebook to as a medium

to ask other users for money.





*Figure 7: Posts from HAMAS on Facebook requesting donations*

89.     This same source also reported that a different Hamas supporter was using Facebook and Twitter to support crowdfunding for HAMAS. [26]

90.     As discussed more fully below, YouTube approves of HAMAS videos allowing for ads to be placed with HAMAS videos.  YouTube earns revenue from these advertisements and shares a portion of the proceeds with HAMAS.

91.     Below is an example of a video posted by HAMAS on YouTube with a propaganda video seeking viewers to support HAMAS's cause online.

---

26 http://david-collier.com/facebook-pipeline-funding-hamas-terrorism/



*Figure 8: A YouTube video asking users to support HAMAS*

### HAMAS Uses Defendants' Sites to Spread Its Propaganda

92.     HAMAS also uses Defendants' sites to spread propaganda and incite fear by posting graphic photos and videos of its terrorist feats.

93.     Through Defendants' sites, HAMAS disseminates its official media publications as well as posts about real-time atrocities and threats to its perceived enemies.

94.     Ismail Haniyeh, the top HAMAS leader in the Gaza Strip, has maintained a Twitter account since March 2012 and has 27.2 thousand followers. Khaled Mashaal, the group's chief, has had an account active since August 2014, now with 2,314 followers. The main HAMAS Twitter page, active since October 2010, has 37.1 thousand followers.

95.    On   March   13,   2015,   HAMAS launched a   Twitter   campaign #AskHAMAS to reach out to potential recruits and connect with the general public.

96.          HAMAS's  official  websites  have  included  hyperlinks  (signified by Facebook's symbol "f") to Facebook pages operated by HAMAS, as shown in the following screenshot from HAMAS's primary official Arabic website:



*Figure 9: Screenshot of HAMAS website with hyperlinks to Defendants' websites*

97.    HAMAS  information  websites  and  forums  also  maintain  Facebook accounts, which they use to promote and carry out HAMAS activities. Some of these HAMAS  information  websites  and  forums  maintain  multiple  Facebook  sites, including separate Facebook sites in Arabic and English.  One example of HAMAS information  websites  and  forums  that  use  Facebook  to  promote  and  carry  out HAMAS activities is the Palestinian Information Center.[27]

---

27 https://www.facebook.com/PalinfoEN/?hc_ref=SEARCH&fref=nf

98.    As discussed more fully below, YouTube approves of HAMAS videos allowing for ads to be placed with HAMAS videos.  YouTube earns revenue from these advertisements and shares a portion of the proceeds with HAMAS.

99.    Below is an example of a video posted by HAMAS propaganda placed on YouTube featuring advertisements.



*Figure 10: A HAMAS YouTube video featuring advertisements for TreadClimber and AAA*

### Defendants Knowingly Permit HAMAS to Use Their Social Network

100.    In defiance of federal criminal laws that prohibit providing services to designated terrorists, Defendants enable HAMAS terrorists to come out of hiding and present a public face under their own brand and logo, and under the brands and logos of Defendants.

101.   Defendants' provision of support to HAMAS is not simply a matter of whether HAMAS abuses its use of Defendants' Platform and Services, or whether Defendants abuse its editorial judgment regarding the content of HAMAS's videos; under federal law, Defendants have no discretion about whether to provide its Platform and Services to HAMAS—it is prohibited by U.S. federal law from doing so.

102.   Indeed, in an effort to appear as if Defendants are complying with U.S. federal law, Defendants' own terms and policies ostensibly bar HAMAS and other foreign terrorist organizations and individuals designated under U.S. law from using Defendants platforms, and Defendants have publicly claimed that they does not permit HAMAS to use Defendants' Platforms and Services.

103.   However, in practice, Defendants have nevertheless knowingly provided their Platforms and Services to HAMAS, its members, and affiliates, as well as other foreign terrorist organizations and individuals designated under U.S. law.

104.   Thus, by falsely representing that it does not permit HAMAS to use Defendants' Platforms and Services when in fact they have knowingly continued to provide their Platforms, Services and accounts to HAMAS, Defendants have concealed and disguised the nature, location, source, or ownership of material

support or resources, knowing that they are used in preparation for, or in carrying out, criminal terrorist activity.

105.   The value of Defendants' Platforms and Services to HAMAS is demonstrated by the many channels and accounts maintained and used by HAMAS, its members, and affiliates to promote and carry out activities of HAMAS, and the many HAMAS videos these users post on Defendants' platforms.

106.   These HAMAS-affiliated channels, accounts, and videos openly display the emblems and symbols of HAMAS and its affiliated entities.

107.   The members and affiliated entities of HAMAS are so identified with and controlled by HAMAS that one who provides material support or resources to any of them is in fact providing material support and resources to HAMAS.

108.   HAMAS has used Defendants' platforms as an extremely effective means of announcing and releasing its propaganda materials, which include music, speeches, graphic acts of violence, full-length videos and more, presenting an image of technical sophistication and advanced media capabilities.

## The Use of Twitter by Terrorists Has Been Widely Reported

109.   For years, the media has reported on the HAMAS use of Defendants' social media sites and their refusal to take any meaningful action to stop it.

110.   On November 12, 2012, thedailybeast.com released an article titled *Is HAMAS's Twitter Account Illegal*?[28]

111.   On July 14, 2014, BBCwatch.org reported the use of misleading pictures on Twitter by HAMAS for propaganda purposes.[29]

112.   On March 13, 2015, several agencies (including the Washington post, Ibtimes, and news.vice.com) reported that HAMAS launched a Twitter campaign #AskHAMAS. The campaign promised responses from the group's leaders, or as they called it, "Truth from the mouth of the horse." Bassem Naim, a HAMAS official, said the campaign was "a step by HAMAS to introduce it to the world in new languages – English, French and German – on the basis that the source is a direct HAMAS official, not through mediators or translators."[30]

### The Use of Facebook by HAMAS has Been Widely Reported

113.   On January 10, 2012, CBC News Released an article stating that Facebook is being used by terrorist organizations for recruitment and to gather military and political intelligence "Many users don't even bother finding out who they are confirming as 'friend' and to whom they are providing access to a large

---

28 http://www.thedailybeast.com/articles/2012/11/20/is-hamas-s-twitter-account-illegal.html
29 https://bbcwatch.org/2014/07/14/hamas-uses-bbc-brand-for-fauxtography-propaganda
30 *See* http://www.ibtimes.com/ask-hamas-palestinian-groups-twitter-campaign-challenge-terror-label-backfires-1846262; http://www.news.com.au/technology/online/social/hamas-mocked-as-twitter-campaign-backfires/news-story/ff289a6c06b99d9b5b144bb693b274c1; https://news.vice.com/article/askhamas-twitter-users-are-trolling-palestinian-islamist-groups-pr-campaign; https://www.washingtonpost.com/news/worldviews/wp/2015/03/12/hamass-askhamas-twitter-campaign-is-being-mocked-and-it-hasnt-even-started-yet/?utm_term=.b221ac9016e9

amount of information on their personal life. The terrorists themselves, in parallel, are able to create false profiles that enable them to get into highly visible groups," he said[31].

114. On January 10, 2014, the Washington post released an article titled *Why aren't YouTube, Facebook, and Twitter doing more to stop terrorists from inciting violence?*[32]

115. On October 28, 2015, at the Radicalization: Social Media And The Rise Of Terrorism hearing it was reported that Zale Thompson who attacked four New York City Police Officers with an ax posted on Facebook "[w]hich is better, to sit around and do nothing or to wage jihad." [33]

116. At this same hearing, it was also reported that in September 2014 "Alton Nolen, a convert to Islam and ex-convict who had just been fired from his job at a food processing plant, entered his former workplace and beheaded an employee with a knife. This attack combines elements of workplace violence and terrorism. Nolen had been a voracious consumer of IS propaganda, a fact reflected on his Facebook page.[34]"

---

31 http://www.cbc.ca/news/technology/terrorist-groups-recruiting-through-social-media-1.1131053
32 https://www.washingtonpost.com/posteverything/wp/2014/07/10/farrow-why-arent-youtube-facebook-and-twitter-doing-more-to-stop-terrorists-from-inciting-violence/
33 https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Purdy-TRC-Testimony.pdf
34 https://oversight.house.gov/wp-content/uploads/2015/10/10-28-2015-Natl-Security-Subcommittee-Hearing-on-Radicalization-Gartenstein-Ross-FDD-Testimony.pdf

117.   On November 11, 2015, it was reported that one of the attackers from a terrorist bus attack two weeks prior "was a regular on Facebook, where he had already posted a "will for any martyr." Very likely, they made use of one of the thousands of posts, manuals and instructional videos circulating in Palestinian society these last few weeks, like the image, shared by thousands on Facebook, showing an anatomical chart of the human body with advice on where to stab for maximal damage." [35]

118.   On April 8, 2016, the Mirror reported that "Jihadi fighters in the Middle East are using Facebook to buy and sell heavy duty weaponry." Because of Facebook's ability to create groups and to send secure payments through its Messenger application, it works as the perfect platform for illegal deals." [36]

119.   On March 30, 2018 a memorandum written by a senior Facebook executive was widely publicized through the news[37].   Part of the memorandum states:

> We connect people.
>
> That can be good if they make it positive. Maybe someone finds love. Maybe it even saves the life of someone on the brink of suicide. So we connect more people.
>
> That can be bad if they make it negative. Maybe it costs a life by exposing someone to bullies. Maybe someone dies in a

---

35 http://www.nytimes.com/2015/11/03/opinion/the-facebook-intifada.html?_r=1
36 http://www.mirror.co.uk/tech/isis-terrorists-use-facebook-buy-7713893
37 https://www.theverge.com/2018/3/30/17179100/facebook-memo-leaks-boz-andrew-bosworth

terrorist attack coordinated on our tools.

And still we connect people.

The ugly truth is that we believe in connecting people so deeply that anything that allows us to connect more people more often is *de facto* good.

120.   This memorandum was dated June 18. 2016 which was six days after the Pulse nightclub attack, four days after a lawsuit against Facebook was filed concerning the November 13, 2015 terror attack in Paris, and a few days after it became widely reported that Omar Mateen had used Facebook before and during the Pulse attack.   Clearly, the timing of this memo indicates that Facebook was well aware that its site was being used by ISIS for terrorist activities and Facebook was putting growth over people being harmed in terrorist attacks.

121.   In April, 2018, Facebook CEO Mark Zuckerberg testified before Congress.   During the testimony, Facebook admitted that it was responsible for content:

> SULLIVAN: But you said you're responsible for your content, which makes ...
>
> ZUCKERBERG: Exactly.
>
> SULLIVAN: ... you kind of a publisher, right?
>
> ZUCKERBERG: Well, I agree that we're responsible for the content, but we don't produce the content. I — I think that when people ask us if we're a media company or a publisher, my understanding of what — the heart of what they're really

getting at, is do we feel responsibility for the content on our platform.

The answer to that, I think, is clearly "yes." And — but I don't think that that's incompatible with fundamentally, at our core, being a technology company where the main thing that we do is have engineers and build products.

## Google's Services

122.    Google provides sophisticated yet easy-to-use online products and services (collectively, "Services"), including the online video platform known as "YouTube."

123.    Google's Services include use of Google's computer infrastructure, network, applications, tools and features, communications services, and more.

124.    Google's sophisticated platform ("Platform") is comprised of highly advanced software, algorithms, computer servers and storage, communication devices, computer applications and more.

125.    Google's Platform is created, based upon, and derived from scientific, technical or other specialized knowledge.

126.    Google also provides additional specialized tools and features as part of its Services and Platform, including: "Social Plugins" for integrating Facebook with external websites; "Badges" for sharing information on external websites; various smartphone applications; other tools for monitoring, scheduling, and creating alerts; and more.

127.   Google's Services and Platform thus extend beyond providing or performing traditional services of a publisher.

128.   Unlike traditional internet websites and "bulletin board"-type services (such as "Craig's List" or "Backpage"), which receive and publish advertisements or notices submitted by users or the public, Google's Platform functions as a technological tool in the hands of its users that enables users to establish their own YouTube "channels" or "accounts," and to serve as self-publishers of content on their own "channels" or "accounts."

129.   Google does not hold itself out as an editor, publisher, or speaker of the content its users publish on their own "channels" or "accounts."

130.   Certain uses or features of Google's Services and Platform are only available to its registered users, who register and establish an account with Google by inputting identifying information and clicking on a "sign up" button.

131.   For example, only registered users may establish a YouTube "channel," post videos on Google's Platform, or post comments on the page of a YouTube channel or video.

132.   Google publicizes on the YouTube website a statement of "Terms of Service" for the use of the YouTube platform and services.

133.   Google represents that these Terms of Service "form a legally binding agreement between [the user] and YouTube in relation to [the user's] use of the Service."

134.   Regarding content submitted to YouTube by users, the Terms of Service state in part: "You retain all of your ownership rights in your Content, but you are required to grant limited license rights to YouTube and other users of the Service."

135.   Google requires users to provide certain identifying information in order to register and obtain a Google account, which normally includes the user's name, a working telephone number and a valid email address.

136.   Among Google's purposes of requiring identifying information for registration is to enable Google to use verification processes to determine the identity of the user, reduce the occurrence of fraudulent Google accounts, identity theft, and similar deceptive practices.

137.   Google does not publish the user's identifying information provided for registration.

138.   Unless a user employs technological masking or deceptive means to disguise the user's physical location when registering for a Google account, Google normally can and does determine and record the approximate geographic location of

the user at the time of registration based upon the Internet Protocol ("IP") address and similar data automatically available to Google about the user.

139.   Thus, for example, unless a user in Syria or Iraq employs a technological masking or deceptive means to disguise the user's physical location when registering for a Google account, Google normally can and does determine and record that the user is located in Syria or Iraq.

140.   The identifying information, IP address, geographical information, and other data collected by Google for determining the identity of the user can also be used by Google to determine whether the user has or has had other Google accounts as well.

141.   Is it not necessary to view the "Terms of Service" or other policies or conditions of Google's Services to proceed with registration.

142.   Google does not require users to specify the content they intend to publish using Google's Services and Platform when they register, nor does Google pre-screen user registrations based upon such anticipated content.

143.   Google users themselves publish content on their own YouTube channels or accounts using Google's Services and Platform.

144.   Google does not preview or edit content published by users to their own YouTube channels or accounts.

145. When a user publishes content to the user's YouTube channel or account, the content is published in "real-time" or nearly "real-time."

146. When a Google user publishes content on his own YouTube channel or account, other Google users or viewers do not attribute such content to Defendant Google, nor do they consider Google to be the speaker or publisher or such content.

147. Google has expended and continues to expend enormous sums of money to develop, operate, and update its Platform and Services, which it provides to registered users free of charge.

148. The Platform and Services that Google provides to its users free of charge are very valuable to users, who could not replicate all the benefits received from Google without enormous financial investment.

149. Google's free provision of its Platform and Services to users thus enables users to obtain these benefits while freeing-up money and other resources to spend on other items or activities.

150. Google's Platform and Services can be used to post and distribute videos publicly, or privacy settings are available to enable users to communicate, share, or distribute videos or messages privately.

151. Google enables registered users to "subscribe" to YouTube "channels" in order to receive notifications of new videos or messages posted on those channels.

152.   Google permits users to create multiple YouTube channels accounts and to subscribe to hundreds (if not an unlimited number) of YouTube channels.

## The Use of YouTube by HAMAS has Been Widely Reported

153.   The media has widely reported on terrorists' use of YouTube and YouTube's refusal to take any meaningful action to stop it.

154.   On January 10, 2014, the Washington post released an article titled *Why aren't YouTube, Facebook, and Twitter doing more to stop terrorists from inciting violence?*[38]

155.   On July 7, 2014, CBS Local reported that "militants post beheading videos on sites like Google's YouTube, giving an image the chance to go viral before being shut down." [39]

156.   On January 8, 2015, CBS News released an article titled *YouTube too overloaded to filter terrorist videos.*[40]

157.   On August 6, 2015, Journal-Neo.org reported that "The well-known online video platform YouTube serves as the main media platform of these radical fighters." [41]

---

38 https://www.washingtonpost.com/posteverything/wp/2014/07/10/farrow-why-arent-youtube-facebook-and-twitter-doing-more-to-stop-terrorists-from-inciting-violence/
39 http://sanfrancisco.cbslocal.com/2015/07/24/should-twitter-facebook-be-held-liable-for-a-terrorist-attack/
40 http://www.cbsnews.com/news/youtube-too-overloaded-to-filter-terrorist-videos/
41 http://journal-neo.org/2015/06/08/hi-tech-tools-of-isil-propaganda/

158.   On August 29, 2015, the Independent released an article about how "The military wing of the Islamist group HAMAS has posted a propaganda video appearing to show off a new underground tunnel from its base in Gaza into Israel." [42]

159.   On January 25, 2016, USA Today released an article  titled "Remove terrorists from YouTube: Column," asserting that "If a curious individual searches for an al-Awlaki sermon online, YouTube will present a catalog of works that quickly leads from deceptively benign theological-based musings to calls for terrorist violence after only three or four videos."[43]

160.   Defendants' Platforms are especially useful to HAMAS because, among other things, it is provided free of charge, allows unlimited usage, offers the ability to reach an enormous number of users instantaneously, provides the ability to distribute videos without disclosing location, enables like-minded users to connect and communicate, affords both public and private communications, and integrates other social media platforms and services.

161.   Moreover, the money HAMAS saves by using Defendants' Platforms frees up funds for HAMAS to devote to even more terrorist attacks.

---

42 http://www.independent.co.uk/news/world/middle-east/hamas-post-youtube-video-appearing-to-show-underground-tunnel-from-gaza-into-israel-10478176.html
43 http://www.usatoday.com/story/opinion/2016/01/25/remove-terrorists-youtube-social-media-column/78939982/

162.   In all of these ways and more, Defendants' Platforms and Services have played an essential role in enabling HAMAS to grow, develop, and project itself as one of the most feared terrorist organization in the world.

163.   The sophisticated technological capabilities that Defendants' Platforms and Services give to HAMAS have had an enormous impact on HAMAS's methods and success in recruiting, indoctrination, training, conducting terrorist operations, and engaging in psychological warfare.

164.   As part of an illegal terrorist organization, HAMAS leaders and operatives must often operate secretly and keep their specific whereabouts hidden to avoid being captured or killed, and thus their ability to personally meet with or communicate directly with other HAMAS members and the public is normally severely limited.

165.   Through Defendants' Platform and Services, HAMAS leaders, operatives, and recruits are able to make themselves available to HAMAS for HAMAS's terrorist activities.

166.   Thus, through its actions, Defendants have aided and abetted, conspired, and provided personnel to HAMAS by making HAMAS leaders, operatives, and recruits available to HAMAS to conspire, plan, prepare and carry out terrorist activity.

167.   In addition, Defendants have enabled HAMAS to continue these activities by concealing its own provision of material support and resources to HAMAS, as well as the material support and resources provided by HAMAS leaders, members, affiliates and recruits to HAMAS via Defendants' Platform and Services.

**Defendants Have Rebuffed Numerous Requests to Comply with U.S. Law**

168.   Throughout this period, both the U.S. government and the public at large have urged Defendants to stop providing its services to terrorists.

169.   In December 2011, an Israeli law group threatened to file suit against Twitter for allowing terrorist groups like Hezbollah to use its social network in violation of U.S. anti-terrorism laws.

170.   In December 2012, several members of Congress wrote to FBI Director Robert Mueller asking the Bureau to demand that the Twitter block the accounts of various terrorist groups.

171.   In a committee hearing held on August 2, 2012, Rep. Ted Poe, chair of the House Foreign Affairs Subcommittee on Terrorism, lamented that "when it comes to a terrorist using Twitter, Twitter has not shut down or suspended a single account." "Terrorists are using Twitter," Rep. Poe added, and "[i]t seems like it's a violation of the law." In 2015, Rep. Poe again reported that Twitter had consistently

failed to respond sufficiently to pleas to shut down clear incitements to violence by terrorists.

172.   Recently, former Secretary of State Hillary Clinton has urged Defendants to become more aggressive in preventing terrorists from using their network. "Resolve means depriving jihadists of virtual territory, just as we work to deprive them of actual territory," she told one audience. Later, Secy. Clinton stated that Twitter and other companies "cannot permit the recruitment and the actual direction of attacks or the celebration of violence by this sophisticated Internet user. They're going to have to help us take down these announcements and these appeals."

173.   On January 7, 2016, White House officials announced that they would hold high- level discussions with Defendants to encourage them "to do more to block terrorists" from using their services. "The primary purpose is for government officials to press the biggest Internet firms to take a more proactive approach to countering terrorist messages and recruitment online. . . . That issue has long vexed U.S. counterterrorism officials, as terror groups use Twitter . . . to spread terrorist propaganda, cultivate followers and steer them toward committing violence. But the companies have resisted some requests by law-enforcement leaders to take action . . ."

**Defendants Have Failed to Prevent HAMAS From Using its Services**

174.   Despite these appeals, Defendants have failed to take meaningful action.

175.   In a January 2011 blog post entitled "The Tweets Must Flow," Twitter co-founder Biz Stone and Twitter General Counsel Alex Macgillivray wrote: "We don't always agree with the things people choose to tweet, but we keep the information flowing irrespective of any view we may have about the content."

176.   On June 20, 2014, Twitter founder Biz Stone, responding to media questions about ISIS's use of Twitter to publicize its acts of terrorism, said, "[i]f you want to create a platform that allows for the freedom of expression for hundreds of millions of people around the world, you really have to take the good with the bad."

177.   In September 2014, Twitter spokesperson Nu Wexler reiterated Twitter's hands-off approach, telling the press, "Twitter users around the world send approximately 500 million tweets each day, and we do not monitor them proactively." "The Twitter Rules" reiterated that Twitter "do[es] not actively monitor and will not censor user content, except in exceptional circumstances." In February 2015, Twitter confirmed that it does not proactively monitor content and that it reviews only that content which is reported by other users as violating its rules.

178.   Most technology experts agree that Defendants could and should be doing more to stop HAMAS and other terrorist groups from using Defendants' social networks. "When Twitter says, 'We can't do this,' I don't believe that," said Hany Farid, chairman of the computer science department at Dartmouth College. Mr. Farid, who co-developed a child pornography tracking system with Microsoft, says that the same technology could be applied to terror content, so long as companies

were motivated to do so. "There's no fundamental technology or engineering limitation," he said. "This is a business or policy decision. Unless the companies have decided that they just can't be bothered."

179.   According to Rita Katz, the director of SITE Intelligence Group, "Twitter is not doing enough. With the technology Twitter has, they can immediately stop these accounts, but they have done nothing to stop the dissemination and recruitment of lone wolf terrorists."

180.   Even when Defendants shut down a terrorist-linked account, they do nothing to stop it from springing right back up. According to the New York Times, the Twitter account of the pro- terrorist group Asawitiri Media has had 335 accounts. When its account @TurMedia333 was shut down, it started @TurMedia334. When that was shut down, it started @TurMedia335. This "naming convention — adding one digit to a new account after the last one is suspended — does not seem as if it would require artificial intelligence to spot." Each of these accounts also used the same user photograph of a bearded man's face over and over again. In the hours after the shooting attack in San Bernardino, California on December 2, 2015, @TurMedia335 tweeted: "California, we have already arrived with our soldiers. Decide how to be your end, with knife or bomb."

181.   Using this simplistic naming scheme is critical to HAMAS' use of social media.   Without a common prefix, it would be difficult for followers of HAMAS' accounts to know the new name of the account.

182.   Because of the simplistic renaming scheme, Defendants could easily detect names that are likely to be replacement accounts and delete them almost as soon as they are created.  Yet Defendants have failed to implement such a basic account detection methodology.

183.   Furthermore, HAMAS keeps track of the followers of each account. Once an account is deleted by one of the Defendants and then regenerated, HAMAS uses a bot to contact each of its followers asking them to connect.  This allows HAMAS to reconstitute the connections for each account very quickly.  Defendants could easily detect such activity but chose not to.

184.   Although Defendants proclaim that they do take accounts down including those of HAMAS, Defendants do nothing to keep those accounts down. HAMAS and other nefarious groups are dependent upon having a social media network from which to collect money and conduct terrorist operations including recruitment and radicalization.

185.   The following example illustrates how Defendants allow ISIS to quickly construct networks of followers.  Although the example is based upon an ISIS follower, this example equally applies to other terrorist organizations, including HAMAS.  Below is a posting from Twitter captured on June 20, 2016.  The individual is named "DriftOne00146" and he proudly proclaims that this is the 146th version of his account.  With only 11 tweets, this individual is followed by 349

followers.  This is very suspicious activity.



*Figure 11: DriftOne00146 posting 06/20/2016*

186.   The very next day, this individual now has 547 followers with only 3 additional tweets.



*Figure 12: DriftOne00146 posting June 21, 2016*

187.    The next morning, this individual's account was taken down by Twitter.

That afternoon, he was back up as DriftOne0147 with 80 followers.



*Figure 13: DriftOne0147 posting June 22, 2016*

188.    The very next week on June 28, 2016, the same individual was back up as DriftOne150.  Most disturbing is that his posting of #Bangladesh and #Dhaka just three days before the unfortunate ISIS attack in Dhaka, Bangladesh.



*Figure 14: DriftOne150 posting June 28, 2016*

189.    The day after the attacks, he is now DriftOne0151 and he posts pictures of those individuals who conducted the attacks.



*Figure 15: DriftOne0151 posting July 2, 2016*

190.   What the above example clearly demonstrates is that there is a pattern that is easily detectable without reference to the content.  As such, a content-neutral algorithm could be easily developed that would prohibit the above behavior.  First, there is a text prefix to the username that contains a numerical suffix.  When an account is taken down by a Defendant, assuredly all such names are tracked by Defendants.  It would be trivial to detect names that appear to have the same name root with a numerical suffix which is incremented.  By limiting the ability to simply create a new account by incrementing a numerical suffix to one which has been deleted, this will disrupt the ability of individuals and organizations from using Defendants networks as an instrument for conducting terrorist operations.

191.   Prohibiting this conduct would be simple for Defendants to implement and not impinge upon the utility of Defendants sites.  There is no legitimate purpose for allowing the use of fixed prefix/incremental numerical suffix names.  Preventing the use of these names once a similarly named account would not place a significant burden on Defendants to implement nor would it place any "chilling" effect on the use of Defendants' sites.

192.   Sending   out   large   numbers   of   requests   to   connect   with friends/followers from a newly created account is also suspicious activity.  As shown in the "DriftOne" example above, it is clear that this individual must be keeping track of those previously connected.  When an account is taken down and then re-established, the individual then uses an automated method to send out requests to all those members previously connected.  Thus, accounts for HAMAS and others can quickly reconstitute after being deleted.  Such activity is suspicious on its face.

193.   Clearly, it is not normal activity for a newly created account to send out large numbers of requests for friends and followers immediately after creation.  It is further unusual for those connections requests to be accepted in a very short period of time.  As such, this activity would be easy to detect and could be prohibited by Defendants in a content-neutral manner as the content is never considered; only the conduct.

194.   Furthermore, limiting the rapidity with which a newly created account

can send requests to friends/followers would not place a significant burden on Defendants to implement.  Once again, such activity is suspicious and suggestive of reconstitution of an account which was deleted by Defendants.   In addition, Defendants could easily track that a newly created account similarly named to one previously taken down is sending out large numbers of requests in a very short period of time.

195.   Because the suspicious activity used by HAMAS and other nefarious organizations engaged in illegal activities is easily detectable and preventable and that Defendants are fully aware that these organizations are using their networks to engage in illegal activity demonstrates that Defendants are acting knowingly and recklessly allowing such illegal conduct. HAMAS is dependent on using social media to conduct its terrorist operations.   Limiting HAMAS' ability to rapidly connect and reconnect to supports Thus, Defendants knowing and reckless conduct provides materials support to HAMAS and other nefarious organizations.

196.    Notably, while Twitter has now put in place a rule that supposedly prohibits "threats of violence . . . including threatening or promoting terrorism," many ISIS-themed accounts are still easily found on Twitter.com. To this day, Twitter also permits groups designated by the U.S. government as Foreign Terrorist Organizations to maintain official accounts, including Hamas (@hamasinfo and @HamasInfoEn) and Hizbollah (@almanarnews).

197.     On November 17, 2015, the hacking group Anonymous took down several thousand ISIS Twitter accounts.  That an external third party could identify and disrupt ISIS Twitter accounts confirms that Twitter itself could have prevented or substantially limited other terrorist groups' use of Twitter.

## **Defendants Profit From Allowing HAMAS to Use Their Services**

198.  Astonishingly, Defendants routinely profit from HAMAS.   Each Defendant places ads on HAMAS postings and derives revenue for the ad placement.

199.  These ads are not placed randomly by Defendants.  Instead, they are targeted to the viewer using knowledge about the viewer as well as information about the content being viewed.  The following sites for each Defendant show how targeting           works:           https://business.twitter.com/en/targeting.html, https://www.facebook.com/business/a/online-sales/ad-targeting-details, https://static.googleusercontent.com/media/www.youtube.com/en//yt/advertise/me dias/pdfs/targeting-onesheeter-en.pdf.

200.  By specifically targeting advertisements based on viewers and content, Defendants are no longer simply passing through the content of third parties. Defendants are themselves creating content because Defendants exercise control over what advertisement to match with a HAMAS posting.   Furthermore, Defendants' profits are enhanced by charging advertisers extra for targeting

advertisements at viewers based upon knowledge of the viewer and the content being viewed.

201.   Not only does Defendant Google profit from HAMAS, it shares some of those revenues with HAMAS.  In order for ads to appear associated with a posting on a YouTube video, the poster must create a Google AdSense account.  The poster must the register the account for monetization[44].

> ▼ How can my videos make money?
>
> Once your video is submitted and approved for monetization, YouTube will place ads inside or near the video. After you've associated an AdSense account with your YouTube account, you will earn revenue that is generated from the ads. Learn more

202.   According to Google, each video must be approved in order for ads to be placed.  These videos must meet Googles' terms of service.

> ▼ What types of videos are eligible?
>
> For a video to be eligible, you must own worldwide commercial usage rights to everything in the video and the video must abide by our Terms of Service and Community Guidelines.

203.   Videos that are approved generate revenue for both the poster and for Google.  Therefore, according to its terms, if there are ads associated with a YouTube video, the video has been approved by Google, Google is earning revenue from each view of that video, and Google is sharing revenue with the poster.

204.   With respect to HAMAS, Google has placed ads on HAMAS postings.

---

44 https://www.youtube.com/account_monetization accessed on 5/24/2016.



*Figure 16:  HAMAS video on YouTube with ad place by Google*

205.   Given that ad placement on videos requires Google's specific approval of the video according to Google's terms and conditions, any video which is associated with advertising has been approved by Google.

206.   Because ads appear on the above video posted by HAMAS, this means that Google specifically approved the video for monetization, Google earned revenue from each view of this video.

207.   The video was created by HAMAS and was posted by HAMAS using a known HAMAS account. On information and belief, the poster complied with YouTube's terms and conditions, as did YouTube. Thus, YouTube shared revenue

with HAMAS, the creator and poster of the video in violation of 18 U.S.C. §§ 2339A-B. By providing financial support to HAMAS, Google contributed to the Dallas attack because even if the money was not used directly on the Dallas attack, the money could be used for other purposes freeing HAMAS funds to be used in the Dallas attack.

208.   Google provides functionality to those posting videos to see that their videos are recommended by Google. This functionality is not a traditional publishing function.

209.   Google also recommends content to users based upon the content and what is known about the viewer.[45] Google has recommended ISIS videos to users. Targeting content to users is not a traditional publishing function. By recommended ISIS videos to users, Google assists ISIS in spreading its message and thus provides material support to ISIS. The image below shows a video that was recommended to a user based upon other videos he had viewed in the past.[46] On information and belief, this is a common occurrence.

---

45 *See* "How YouTube's Suggested Videos Work," *YouTube Creator Academy* (Aug. 30, 2017), https://www.youtube.com/watch?v=E6pC6iql5xM.
46 Personal email from Eric Feinberg to Keith Altman dated October 29, 2016.



*Figure 17 YouTube Suggesting Terrorist Content*

210.   In addition, by specifically targeting advertisements based on viewers and content, Google is no longer simply passing through the content of third parties; rather, Google is itself creating and developing content because it exercises control over what advertisement to match with an ISIS video posting on YouTube.

211.   Twitter also profits from material posted by HAMAS by routinely placing ads.  For example, a view of the account of @hamasGlobalPR on January 10, 2017, shows that Twitter placed an ad for Velveeta and Rotel.  As such, Twitter provides material support to HAMAS and is compensated for the effort.



*Figure 18:  HAMAS post on Twitter with ad placed by Twitter*

212.   Facebook also profits from HAMAS postings.  On January 10, 2016, the following screenshot was collected:



*Figure 19: HAMAS post on Facebook with ad placed by Facebook*

213.   As such, Facebook provides material support to HAMAS and is compensated for the effort.

214.   Thus, not only does each Defendant provide material support to HAMAS by allowing HAMAS to make use of their social media sites, each Defendant derives revenue from HAMAS postings irrespective of the content of HAMAS' postings.

### Defendants Allow for Other Extremism Groups to be Educated and Inspired by HAMAS Through Their Websites

215.     Other extremist groups have been inspired and educated through Hama's use of Defendants' sites.

216.     One clear example of this is the manner in which black separatist hate groups have clearly implemented social material created by HAMAS into its own propaganda and methodology.

217.     When the uprising in Ferguson began in 2014, HAMAS sympathizers and members reached out to rioters with support and tweeted advice to the protesters on what to do after getting hit with tear gas.[47]



*Figure 20:  Tweet Showing Interaction Between HAMAS and U.S. Protesters*

---

47 http://www.momentmag.com/22800-2/



*Figure 21: Support given to black separatist hate groups by HAMAS*



*Figure 22: Support given to black separatist hate groups by HAMAS*

218.     Additionally, HAMAS has provided the inspiration for the black separatist hate group propaganda images below. This first image shows a HAMAS member beheading an individual that was clearly the reference for the second image below that was used as black separatist hate group propaganda. That propaganda was shared 8195 times from the Facebook Account it was posted to.

 

*Figure 23: A HAMAS beheading and the black separatist hate groups propaganda to kill police inspired by the beheading photo*

219.   This image was also featured in YouTube videos that called for the killing of officers.



*Figure 24: The HAMAS inspired art being used by black separatist hate groups on YouTube to promote killing police officers*

220.    The BDS movement which is tied to HAMAS, as well as Black Separatist groups,  came out with new videos circulating on the Web to bolster the connection between current goals of Hamas and BLM. One cries out a central theme of "When I see them I see us", implying a connection between Hamas goals and black revolutionaries.[48]

221.    One example is the video below which was uploaded by a user named Black-Palestinian Solidarity. [49] Some of those holding this statements up in the video are convicted terrorists like Rasmeah Odeh who murdered two college boys with a bomb and is fighting deportation from the USA.[50]

48 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/
49 https://www.youtube.com/watch?v=xsdpg-9cmSw&t=0s
50 http://legalinsurrection.com/2015/03/rasmea-odeh-sentenced-to-18-months-in-prison/#comments;



*Figure 25: YouTube video featuring a convicted terrorist Rasmeah Odeh preaching for Black Palestinian Solidarity*

## Black Separatist Hate Groups Have Been Communicating With HAMAS

222. On January 9, 2015, Black journalists, artists and organizers representing Ferguson, Black Lives Matter, Black Youth Project 100 (BYP100), and more have joined the Dream Defenders for a 10-day trip to the occupied Palestinian Territories and Israel. Ahmad Abuznaid, Dream Defenders' legal and policy director and a co-organizer of the delegation, said that the goal of the trip was "primarily to allow for the group members to experience and see firsthand the occupation, ethnic cleansing and brutality Israel has levied against Palestinians, but also to build real

relationships with those on the ground leading the fight for liberation," and that "[i]n the spirit of Malcolm X, Angela Davis, Stokely Carmichael, and many others, we thought the connections between the African American leadership of the movement in the US and those on the ground in Palestine needed to be reestablished and fortified."[51]

223.   The delegation also participated in a weekly riot held in the village of B'illin in the "West Bank" by the Arab Palestinians whom they joined to throw rocks and threaten IDF soldiers and police sent there to guard the security fence.[52]

224.   In 2016, Pro-Palestinian David Sheen completed a whirlwind tour to ISM and BLM leftist groups across the U.S. receiving housing and support from well-known anarchists and other radicals. [53]

225.   In August 2016, the Movement for Black Lives, a coalition of more than 50 Black-led organizations pledged to firmly and consistently stand in solidarity with our Black sisters and brothers in the United States and around the world." The Palestinian BDS National Committee (BNC) reiterated its support for the growing Black Lives Matter movement. The BNC thanked the Movement for Black Lives "for the powerful words of solidarity in the Invest-Divest section of the platform specifically endorsing boycott, divestment, and sanctions (BDS) measures against

---

51 http://www.ebony.com/news-views/dream-defenders-black-lives-matter-ferguson-reps-take-historic-trip-to-palestine#axzz3zje9Kz00
52 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/
53 http://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/

Israel's occupation and apartheid."[54]

## Both Black Separatist Hate Groups and HAMAS Have Called for the Killing of Police.

226.   On December 15, 2014, protests in New York City appeared to show demonstrators apparently calling for the deaths of police officers, hours before violence on the Brooklyn Bridge marred the massive march in protest of police killings of black men, including Eric Garner on Staten Island.

227.   The video, posted on YouTube, shows a few dozen protesters marching down Fifth Avenue at 32nd Street Saturday afternoon. After a few seconds of chanting "Hands up, don't shoot," the demonstrators changed their cry, apparently yelling out in unison "What do we want? Dead cops. When do we want it? Now."[55]

228.   A few days before 4 officers were shot within a 24 hour period, Austin rotesters chant "What's Better Than 12 Dead Cops? 13 Dead Cops."[56]

229.   Additionally, the previously displayed image of a police being beheaded was also featured in social media posts that called for the killing of officers.

---

54 https://electronicintifada.net/blogs/nora-barrows-friedman/palestinians-welcome-movement-black-lives-platform
55 http://www.nbcnewyork.com/news/local/Eric-Garner-Manhattan-Dead-Cops-Video-Millions-March-Protest-285805731.html ; https://www.youtube.com/watch?v=dj4ARsxrZh8
56 http://bluelivesmatter.blue/austin-protesters-chant-dead-cops/





*Figure 26: Facebook posts encouraging the killing of Police officers.*

230.   A 2016 video shot at a 'Black Lives Matter' protest in Portland shows one protest leader imploring others to take violent action by shooting cops or running them over. The footage shows demonstrators holding signs that read "Alton Sterling" and "Philando Castile" while speakers take turns to rally the crowd. The BLM protester stated that "[i]f they go about their burden of whatever they said

you're doing, you pull your pistol out and you f**king bust that" and that "[y]ou pull your pistol out and you bust that! Because at the end of the day, it's going to be you against them."[57]

231.   MAS leader Khalilah Sabra openly discussed the importance of Muslim support for Black Lives Matter, and urged "revolution." Comparing the situation in the United States to the Muslim Brotherhood-led Arab Spring revolutions, she asked, "We are the community that staged a revolution across the world; if we can do that, why can't we have that revolution in America?"

232.   Nihad Awad is the national leader of the Council on American-Islamic Relations (CAIR). CAIR has been identified as a Hamas front by many intelligence leaders in Congress[58]. Awad urged Muslim Americans to take up the cause of Black Lives Matter: "Black Lives Matter is our matter," he said; "Black Lives Matter is our campaign." He was joined by Khalilah Sabra, another Islamic leader in calling for making the BLM movement the cause of Muslims in the United States ultimately leading to "the revolution."

233.   Starting July 1, 2016, a total of 10,704 tweets used the anti-cop hashtag #Fuck12, with a significant spike on the morning of July 6—a day after Alton Sterling was shot dead by police officers in Baton Rouge, Louisiana. According

---

57 http://www.infowars.com/video-black-lives-matter-protest-leader-calls-for-shooting-running-over-cops
58 http://www.islamdaily.org/en/charities/6843.judge-due-to-rule-on-holy-land-defense-challenge.htm

to Urban Dictionary, the "12" specifically refers to narcotics officers. Early on Friday, use of the hashtag to threaten and condemn police continued as events in Dallas unfolded. Some appeared to be using it to celebrate the deaths of the police officers killed in Dallas.  It was also posted on Facebook and Instagram, sometimes alongside pictures of weapons.[59]

234.   Micah Johnson was radicalized, in part, by these organizations calling for the murders of police officers.

### Defendants' Material Support of HAMAS has a Direct Connection to the July 7, 2016, Dallas Police Shootings and is a Proximate Cause

235.   On July 7, 2016, Micah Xavier Johnson ambushed and fired upon a group of police officers in Dallas, Texas, killing five officers and injuring nine others. Two civilians were also wounded.

236.   Of the wounded was Plaintiff Jesus Retana.  He was shot in the line of duty and continues to suffer from his injuries to this day.

237.   The shooting was the deadliest incident for U.S. law enforcement since the September 11 attacks, surpassing two related March 2009 shootings in Oakland, California and a November 2009 ambush shooting in Lakewood, Washington.

238.   The reach of HAMAS has been substantially fueled through their use of Defendants' social media sites which have been used by HAMAS for fundraising

---

59 http://www.vocativ.com/338229/threats-against-police-spiked-before-dallas-police-shootings/

activities, recruitment, and radicalization of individuals.  Furthermore, as discussed above, Defendant Google shares advertising revenue with HAMAS.

239.   Defendants' sites have been used by HAMAS to conduct terrorist operations, including the Dallas attack and have also been used as a recruitment tool and fundraising tool.

240.   As shown above, Defendants have been fully aware that HAMAS and other nefarious organizations use their sites to conduct terrorist operations, recruit, and radicalize.  It was foreseeable to Defendants that HAMAS would radicalize individuals and cause them commit terrorist acts within the United States. Nevertheless, Defendants failed to take meaningful steps to mitigate or eliminate HAMAS' ability to use their sites by either implementing tools to keep HAMAS accounts down once taken down or to eliminate proprietary functionality allowing HAMAS to more efficiently spread its messages.

241.   Nihad Awad is the national leader of the Council on American Islamic Relations (CAIR). CAIR has been identified as a Hamas front by many intelligence leaders in Congress. Awad has more than once proven he is an acolyte for Hamas and its goals, and involved in fundraising and propaganda support, recently appearing at a Muslim American Society national conference where he urged

attendees from the Islamic community to join forces with the likes of Black Lives Matter to achieve their most important goals[60].

242. Awad urged Muslim Americans to take up the cause of Black Lives Matter: "Black Lives Matter is our matter," he said; "Black Lives Matter is our campaign." He was joined by Khalilah Sabra, another Islamic leader in calling for making the BLM movement the cause of Muslims in the United States ultimately leading to "the revolution." The conference concentrated on accusations of "Islamophobia", a campaign begun by Hamas front man Bazian in Berkeley to be further undertaken in alliance with Black Lives Matter. In fact, Awad and Sabra both called upon the Islamic community to make the Black Lives Matter movement an Islamic issue[61].

243. On information and belief, Micah Johnson was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social media sites.

244. This is further substantiated by the Southern Poverty Law Center (SPLC) and news outlets reported that Johnson "liked" the Facebook pages of Black Nationalist organizations such as the New Black Panther Party (NBPP), Nation of Islam, and Black Riders Liberation Army, three groups which are listed by the SPLC

---

60 https://www.centerforsecuritypolicy.org/2016/09/23/hamas-and-black-lives-matter-a-marriage-made-in-hell/
61 *Id.*

as hate groups.[62]

245.   Johnson also "liked" the Facebook page of the African American Defense League, whose leader, Mauricelm-Lei Millere, called for the murders of police officers across the U.S. following the fatal 2014 shooting of Laquan McDonald. In response to the police killing of Alton Sterling, the organization had "posted a message earlier in the week encouraging violence against police"[63]

246.   During the shooting, Micah Johnson made statements to the police. "The suspect said he was upset about Black Lives Matter," Brown told reporters Friday. "He said he was upset about the recent police shootings. The suspect said he was upset at white people.[64]"

247.   HAMAS' used Defendants' sites to radicalize individuals to conduct terrorist activities.  Micah Johnson was radicalized by HAMAS's and other Black Separatist Hate Groups' use of Defendants' tools to conduct terrorist operations.

248.   Without the ability to use Defendants' sites as tools to conduct terrorist operations, HAMAS would have substantially less funding, substantially less exposure, and would not be able to recruit as many operatives.

---

62 https://www.splcenter.org/hatewatch/2016/07/08/dallas-sniper-connected-black-separatist-hate-groups-facebook
63 Id.
64 https://www.washingtonpost.com/world/national-security/police-in-dallas-he-wanted-to-kill-white-people-especially-white-officers/2016/07/08/fe66fe52-4553-11e6-88d0-6adee48be8bc_story.html?utm_term=.25f18ac4f968

249.   Money raised through the use of Defendants sites was used by HAMAS to conduct terrorist operations including the radicalization of Micah Johnson.

250.   Individuals recruited by HAMAS through the use of Defendants sites allowed ISIS to conduct terrorist operations, including the Dallas Police shootings leading to Plaintiffs' damages.

251.   But for HAMAS' use of Defendants sites to raise funds, recruit, and conduct terrorist operations, HAMAS' ability to conduct terrorist operations would essentially evaporate.   Here, had Defendants sites not been used by HAMAS, and other Black Separatist Hate Groups, Micah Johnson would not have been radicalized and the deadly attack in Dallas would not have occurred.

252.   Plaintiff Jesus Retana was wounded in the attack requiring surgery and has suffered and continues to suffer severe emotional distress.

253.   Plaintiff Andrew Moss, as the husband of Jesus Retana has suffered and continues to suffer sever emotional distress to this day.   Furthermore, he has provided care and comfort to Retana since the attack.

**The July 7, 2016 Dallas Police Shooting was an Act of International Terrorism**

254.   One of the stated goals of HAMAS is to use social media including Defendants platforms to radicalize individuals to conduct attacks throughout the world, including the United States.

255.   By radicalizing individuals through social media, this allowed HAMAS to exert its influence without the necessity of direct physical contact with these individuals.   Furthermore, this allows HAMAS to incite or participate in attacks without the necessity of sending its own operatives.

256.   Thus, an attack in the United States to which HAMAS' use of social media caused or contributed constitutes an action by HAMAS.   Given that HAMAS has been declared an international terrorist organization, such an action is an act of international terrorism.

257.   Micah Johnson was radicalized by HAMAS' use of social media.   This was the stated goal of HAMAS.   Johnson then carried out the deadly attacks in Dallas.   Conducting terrorist acts in the United States via radicalized individuals is a stated goal of HAMAS.

258.   Johnson's attack on the Dallas Police was a violent act causing death and injury and constitutes numerous criminal acts under the laws of the United States.

259.   HAMAS intended to intimidate and coerce western populations and governments through a pattern of intimidation and coercion as discussed throughout Plaintiff's First Amended Complaint.

260.   HAMAS acts from outside the United States using Defendants' platforms in a manner and transcends national boundaries because of the international usage of Defendants' platforms.

261.   But for HAMAS' postings using Defendants' social media platforms, Johnson would not have engaged in his attack on the Dallas Police.

262.   Johnson's terrorist actions were a direct result of HAMAS' actions and given that HAMAS is an international terrorist organization, HAMAS's actions were also an act of international terrorism.  Therefore, the Dallas Police attack is an act of international terrorism.

## Defendants Are Information Content Providers

263.   When individuals look at a page on one of Defendants' sites that contains postings and advertisements, the page has been created by Defendants.  In other words, a viewer does not simply see a posting.  Nor does the viewer see just an advertisement.  Defendants create a composite page of content from multiple sources.

264.   Defendants create this page by selecting which advertisement to match with the content on the page.  This selection is done by Defendants' proprietary algorithms that select the advertisement based on information about the viewer and the content being viewed.  Thus there is a content triangle matching postings, advertisements, and viewers.

265.   As discussed above, Defendants tout the ability to target advertisements as a benefit to advertising with the respective networks.  Furthermore, Defendants extract a premium from advertisers for the use of targeted advertising. The ability to target advertising based upon what is known about the viewer and what the viewer is looking at is not a traditional publishing function and did not exist until long after 1996.

266.   Although Defendants have not created the posting nor have they created the advertisement, Defendants have created new unique content by choosing which advertisement to combine with the posting with knowledge about the viewer.

267.   As an example, two people could post content.  A third person could lift a sentence from one person and a sentence from the other and combine them to give a different message than what either person posted, despite not having written one word.  Clearly, this is new content.

268.   No advertiser specifically requests of Defendants that their ads be posted in conjunction with terrorist and extremist content[65].  It is the decision of Defendants to place specific ads with the extremist content based upon what Defendants know of the viewer and what content is being viewed.

269.   Thus, Defendants have incorporated content from others into Defendant created content for revenue purposes.  Defendants' choice to combine

---

[65] https://www.theverge.com/2017/3/24/15053990/google-youtube-advertising-boycott-hate-speech

certain advertisements with certain postings for specific viewers means that Defendants are not simply passing along content created by third parties.

270.   Specifically, as shown above, Defendants have incorporated HAMAS' postings along with advertisements matched to the viewer and HAMAS postings to create new content for which Defendants have earned revenue.   HAMAS has received material support as described above allowing them to conduct terrorist operations.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## LIABILITY FOR AIDING AND ABETTING ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a) and (d)

271.   Plaintiffs repeat and re-alleges each  and every  allegation of  the foregoing paragraphs as if fully set forth herein.

272.   Since October 31, 2001, HAMAS has been international terrorist organization.

273.   HAMAS committed, planned, or authorized activities that involved violence or acts dangerous to human life that are a violation of the criminal laws of the United States, or that would be a criminal violation if committed within the jurisdiction of the United States, including *inter alia*:

a.  solicitation to commit a crime of violence as set forth in 18 U.S.C. § 373;

b.  conspiracy to kill, kidnap, maim, or injure persons or damage property in a foreign country as set forth in 18 U.S.C. § 956;

c.  the prohibition on killing, attempting to kill, causing serious bodily injury, or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332;

d.  the prohibition of providing material support or resources (including *inter alia* services, training, expert assistance, and personnel) to be used for terrorist activity as set out in 18 U.S.C. § 2339A; and

e.  the prohibition of providing material support or resources (including *inter alia* services, training, expert assistance, and personnel) to a designated foreign terrorist organization as set out in 18 U.S.C. § 2339B.

274.  These activities committed, planned, or authorized by HAMAS appear to have been, and were intended to: (a) intimidate or coerce the civilian population of the United States and other countries; (b) influence the policy of the Governments of the United States and other countries by intimidation or coercion; or (c) affect the conduct of the Governments of the United States and other countries by mass destruction, assassination, or kidnapping.

275.   These activities committed, planned, or authorized by HAMAS occurred entirely or primarily outside of the territorial jurisdiction of the United States and constituted acts of international terrorism as defined in 18 U.S.C. § 2331(1).

276.   Plaintiffs have been injured in their person by reason of the acts of international terrorism committed, planned, or authorized by HAMAS.  At all times relevant to this action, Defendants knew that HAMAS was a Foreign Terrorist Organization, that it had engaged in and continued to engage in illegal acts of terrorism, including international terrorism.

277.   Defendants knowingly provided substantial assistance and encouragement to HAMAS, and thus aided and abetted HAMAS in committing, planning, or authorizing acts of international terrorism, including the acts of international terrorism that injured plaintiffs.

278.   By aiding and abetting HAMAS in committing, planning, or authorizing acts of international terrorism, including acts that caused Plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that Plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

279.   The services and support that Defendants purposefully, knowingly or with willful blindness provided to ISIS constitute material support to the

preparation and carrying out of acts of international terrorism, including the attack in which Jesus Retana was wounded.

280.   Defendants' provision of material support to ISIS was a proximate cause of the injury inflicted on Plaintiffs.

281.   By virtue of its violations of 18 U.S.C. § 2339A, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained.

## SECOND CLAIM FOR RELIEF

## LIABILITY FOR CONSPIRING IN FURTHERANCE OF ACTS OF INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a) and (d)

282.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

283.   Defendants knowingly agreed, licensed, and permitted HAMAS its affiliates, and other radical groups to register and use Defendants' sites to promote and carry out HAMAS's activities, including HAMAS's illegal acts of international terrorism and injured plaintiffs.

284.   Defendants were aware that U.S. federal law prohibited providing material support and resources to, or engaging in transactions with, designated foreign terrorist organizations and other specially designated terrorists.

285.   Defendants thus conspired with HAMAS in its illegal provision of Defendants' sites to promote and carry out HAMAS's illegal acts of international terrorism, including the acts that injured plaintiffs.

286.   By conspiring with HAMAS in furtherance of HAMAS's committing, planning, or authorizing acts of international terrorism, including acts that caused each of the plaintiffs to be injured in his or her person and property, Defendants are liable pursuant to 18 U.S.C. § 2333(a) and (d) for threefold any and all damages that plaintiffs have sustained as a result of such injuries, and the costs of this suit, including attorney's fees.

## THIRD CLAIM FOR RELIEF

## PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339a AND 18 U.S.C. § 2333

287.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

288.   The online social media platform and communication services which Defendants knowingly provided to HAMAS, including use of Defendants' services, computers, and communications equipment, substantially assisted HAMAS in carrying out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, creating fear and carrying out attacks among other things.

289.     These services and equipment constituted material support and resources pursuant to 18 U.S.C. § 2339A and they facilitated acts of terrorism in violation of 18 U.S.C. § 2332 that caused the deaths of 5 police officers (4 from Dallas Police and 1 Dart Police) and injured 9 other officers by gunfire and the identified injuries to plaintiffs.

290.     Defendant provided these services and equipment to HAMAS, knowing that they were to be used in preparation for, or in carrying out, criminal acts including the acts that injured the plaintiffs.

291.     As set forth more fully above, but for the material support and resources provided by HAMAS, the attack that injured Plaintiffs would have been substantially more difficult to implement.

292.     By participating in the commission of violations of 18 U.S.C. § 2339A that have caused the plaintiffs to be injured in his or her person, business or property, Defendants are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs have sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)

293.   Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

294. By knowingly (or with willful blindness) providing their social media platforms and communications services, including use of computer and communications equipment, for the benefit of HAMAS, Defendants have provided material support and resources to a designated Foreign Terrorist Organization under the Antiterrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C § 2339B(a)(1).

295. Defendants knew of (or was willfully blind to) HAMAS' terrorist activities.

296. Defendants knew (or was willfully blind to the fact) that HAMAS had been designated a Foreign Terrorist Organization by the United States Government.

297. Defendants' violation of 18 U.S.C. § 2339B proximately caused the damages to plaintiff described herein.

298. By knowingly (or with willful blindness) providing material support to a designated Foreign Terrorist Organization, Defendants are therefore civilly liable for damages to Plaintiff for his injuries pursuant to 18 U.S.C. § 2333(a).

## FIFTH CLAIM FOR RELIEF

### CONCEALMENT OF MATERIAL SUPPORT AND RESOURCES TO A DESIGNATED FOREIGN TERRORIST ORGANIZATION IN VIOLATION OF 18 U.S.C. § 2339C(c) AND 18 U.S.C. § 2333(a)

299. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

300.   By knowingly concealing or disguising the nature, location, source, ownership, or control of material support or resources, knowing that the material support or resources were provided to ISIS in violation of 18 U.S.C. § 2339B, Defendants violated 18 U.S.C. § 2339C(c).

301.   By concealing such material support and resources, Defendants enabled and prolonged HAMAS's use of such material support and resources to carry out terrorist activities, including the acts of international terrorism that killed or injured the Plaintiffs.

302.   Defendants' violation of 18 U.S.C. § 2339C(c) proximately caused the injuries to plaintiffs described herein.

303.   By knowingly concealing material support or resources as described herein, Defendants are therefore civilly liable for damages to plaintiffs for their injuries pursuant to 18 U.S.C. § 2333(a).

## SIXTH CLAIM FOR RELIEF

### PROVISION OF FUNDS, GOODS, OR SERVICES TO OR FOR THE BENEFIT OF SPECIALLY DESIGNATED GLOBAL TERRORISTS IN VIOLATION OF EXECUTIVE ORDER NO. 13224, 31 C.F.R. Part 594, 50 U.S.C. § 1705, AND 18 U.S.C. § 2333(a)

304.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

305.   Defendants knowingly and willfully engaged in transactions with, and provided funds, goods, or services to or for the benefit of, Specially Designated Global Terrorists ("SDGTs"), including HAMAS, its leaders, and members, in violation of EO 13224, 31 C.F.R. Part 594, and 50 U.S.C. § 1705.

306.   The actions of Defendants constituted acts of international terrorism as defined in 18 U.S.C. § 2331, and proximately caused the plaintiffs' injuries.

307.   Defendants are liable pursuant to 18 U.S.C. § 2333(a) for any and all damages that plaintiffs have sustained as a result of such injuries.

## SEVENTH CLAIM FOR RELIEF

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

308.   Plaintiffs repeat and reallege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

309.   Defendants engaged in negligent behavior by providing services to HAMAS.

310.   Defendants' acts of providing services to HAMAS constituted a willful violation of federal statutes, and thus amounted to a willful violation of a statutory standard.

311.   As a direct, foreseeable and proximate result of the conduct of Defendants as alleged hereinabove, Plaintiffs have suffered severe emotional

distress, and therefore Defendants are liable to Plaintiffs for Plaintiffs' severe

emotional distress and related damages.

## **PRAYER FOR RELIEF**

312.     WHEREFORE, Plaintiff requests that the Court:

a.  Accept jurisdiction over this action;

b.  Enter judgment against Defendants and in favor of Plaintiff for compensatory damages on all claims in an amount to be determined at trial;

c.  Enter judgment against Defendants and in favor of Plaintiff for treble damages pursuant to 18 U.S.C. § 2333;

d.  Enter judgment against Defendants and in favor of Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

e.  Order any equitable relief to which Plaintiff might be entitled;

f.  Enter an Order declaring that Defendants has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*; and

g.  Grant such other and further relief as justice requires.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable.


Date: February 13, 2019

/s/ Michael Richardson

**Richardson Koudelka**
Michael D. Richardson
Two Turtle Creek
3838 Oak Lawn, Suite 450
Dallas, Texas 75219
214-217-7575
mrichardson@rklawtexas.com

**Excolo Law, PLLC**
Keith Altman (*pro hac vice* pending)
26700 Lahser Road, Suite 401
Southfield, MI 48033
516-456-5885
kaltman@excololaw.com


Ari Kresch (*pro hac vice pending*)
26700 Lahser Road, Suite 401
Southfield, MI 48033
1-800-LawFirm
akresch@1800lawfirm.com

*Attorneys for Plaintiffs*